

**SO ORDERED,**

**Judge Jason D. Woodard**

**United States Bankruptcy Judge**

**The Order of the Court is set forth below. The case docket reflects the date entered.**

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF MISSISSIPPI

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| GERALD GOODIN and | ) | Case No.:   12-13237-JDW |
| DELORES GOODIN, | ) | |
| | ) | |
| DEBTORS. | ) | Chapter 11 |

| | | |
|---|---|---|
| RENASANT BANK, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | A.P. No.:   12-01115-JDW |
| | ) | |
| GERALD GOODIN  and | ) | |
| DELORES GOODIN, | ) | |
| | ) | |
| DEFENDANTS. | ) | |

## <u>MEMORANDUM OPINION</u>

This adversary proceeding is before the Court on the Complaint to
Determine Dischargeability (A.P. Dkt. # 1) filed by Renasant Bank
("Renasant") against debtor/defendants Gerald and Delores Goodin (the

"Debtors"), alleging that certain debts owed to Renasant by the Goodins are nondischargeable pursuant to 11 U.S.C. § 523(a)(2),(4),(6) and (11).[1]   A final non-dischargeable judgment against Mr. Goodin in the amount of $7,069,059.42, was entered on November 13, 2015 (A.P. Dkt. # 75).[2] Accordingly, only Renasant's claims against Mrs. Goodin were tried on August 29 and 30, 2016.

Scott Hendrix represented Renasant at trial, and Mrs. Goodin represented herself.[3]   The Court heard arguments and received documents into evidence, either by stipulation of the parties or without objection by either party.   The Court heard testimony from both Mr. and Mrs. Goodin; Renasant's former community president in Louisville, Mississippi, Buster McAdory; and Renasant's representative, Scott Williams.   At the conclusion of the trial, the Court took the matter under advisement. For the reasons set

[1] All statutory references are to Title 11 of the United States Code (the "Bankruptcy Code"), unless otherwise indicated.

[2] Said judgment was the result of an Offer of Judgment (A.P. Dkt. # 68) by Gerald Goodin and acceptance thereof by Renasant Bank (A.P. Dkt. # 74).

[3] A hearing on the Motion to Withdraw as Attorney filed by Craig Geno was held on August 9, 2016, and the Court entered an Order permitting Mr. Geno's withdrawal (which was not opposed by Mrs. Goodin).   At the August 9 hearing, the Court made it clear to Mrs. Goodin that she was encouraged to obtain new counsel, but that the trial scheduled for August 29 would not be continued on that basis.   Mrs. Goodin indicated that she did not want a continuance and wanted to get the trial behind her.   Nevertheless, at the beginning of the trial, Mrs. Goodin made an *ore tenus* motion to continue the trial so that she could attempt to retain new counsel.   The Court denied that *ore tenus* motion for the reasons set forth on the record at both the August 9 hearing and the August 29 trial.

forth herein, the Court finds and concludes that the debts owed by Mrs. Goodin to Renasant are nondischargeable.[4]

## I.   <u>JURISDICTION</u>

This Court has jurisdiction pursuant to 28 U.S.C. §§ 151, 157(a) and 1334(b) and the United States District Court for the Northern District of Mississippi's Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc Dated August 6, 1984.  This is a core proceeding arising under Title 11 of the United States Code as defined in 28 U.S.C. § 157(b)(2)(I) and (O).

## II.   <u>FINDINGS OF FACT</u>[5]

This matter arises out of 21 separate loans made under a master loan agreement between Winston Forest Products, Inc. ("WFP") and Renasant, all of which were personally guaranteed by the Debtors.  The Debtors and WFP have an extensive loan history with Renasant[6], having financed around 180 timber tract projects through Renasant over the course of several years.

---

[4] This Memorandum Opinion constitutes findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, applicable to adversary proceedings in bankruptcy pursuant to Federal Rule of Bankruptcy Procedure 7052.

[5] To the extent any of the findings of fact are considered conclusions of law, they are adopted as such. To the extent any of the conclusions of law are considered findings of fact, they are adopted as such.

[6] The Debtors' and WFP's lending relationship began with Inter-City Federal Savings Bank ("Inter-City"),which was acquired by Renasant in 1999.  Mr. McAdory was an officer with Inter-City and was the primary banker for the Debtors.

## A. Operation of Winston Forest Products, Inc.

WFP was a timber broker.  It bought and sold timber, but did not cut its own timber.  The Debtors formed WFP in 1998, each owning a 50% share. At all times the Debtors were WFP's only officers, directors, and owners.  Mr. Goodin was the president; Mrs. Goodin was the vice president and secretary. The Debtors have been married for over 40 years and made clear that they were partners in every aspect of their lives, both personal and business.  The Debtors had equal authority over WFP and were each authorized to open bank accounts, negotiate financial instruments, and sign documents (including promissory notes, corporate resolutions, and checks) on its behalf. Mr. Goodin selected timber tracts and negotiated prices.  Mrs. Goodin was the bookkeeper.  She wrote checks, sent faxes and emails, made deposits and performed other banking and office functions.  Mrs. Goodin signed over $30 million worth of checks written out of WFP's Renasant bank accounts from 2005 through 2012.

WFP did not keep any books or records or observe any corporate formalities, other than the filing of annual reports with the Mississippi Secretary of State to maintain its corporate status. WFP never held shareholder meetings or elections of any kind. Despite the fact that approximately $74 million flowed through WFP between 2005 and 2012, no one ever reconciled the checkbook or kept any written books or records.  Mrs.

Goodin testified that Mr. Goodin kept track of everything "in his head." Mrs. Goodin was always a paid employee of WFP. Her salary was around $200 per week until Mr. Goodin turned 62. At that point, she received a raise equal to what his salary had been, and Mr. Goodin ceased taking a salary. Mr. Goodin testified that he made this change so that his income would not decrease his social security payments. The shifting of his salary to his wife, however, allowed their household income to remain unchanged.

The Debtors also treated WFP's bank accounts and credit cards as their own, routinely paying personal and household bills from WFP's funds. WFP paid most of the Debtors' household expenses, including regular maid and lawn service. WFP paid for the Debtors' electricity, water, cell phones, vehicles, gasoline, pest control, and home, car, and health insurance. The Debtors did operate WFP from their home, but all of these expenses were completely paid by WFP. The Debtors also used the company credit card to pay for clothes, vacations, cell phones, restaurants, and other personal activities. WFP paid for the Debtors' fishing and hunting memberships. WFP also gave money to the Debtors' children. The Debtors never reimbursed WFP for personal expenses.

## B. The Lending Relationship

The Debtors had a long-standing relationship with Buster McAdory, who was their personal banker. Mr. McAdory testified that he has known the

Debtors since high school and, until 2012, always considered them to be trustworthy, honest people.  Mr. McAdory became Community President of Renasant in Louisville, Mississippi, in 2005, but the Debtors and WFP remained his customer even after he was promoted.

Between 1998 and 2012, WFP financed approximately 180 timber projects through sub loans under the master loan agreement. On November 30, 2011, Mr. Goodin signed the final renewal of WFP's Master Loan Agreement with Renasant in the maximum principal amount of $2.5 million (the "Master Note").  The Master Note was secured by certificates of deposit and deeds of trust on 75 acres, the Debtors' personal residence, and an additional 60 acres of timberland and timber.  In addition, both Debtors signed a continuing guaranty of the Master Note.[7]  Under the Master Note, the parties would sign sub notes on each separate timber tract brokered by WFP, which were secured by all of the same collateral as the Master Note as well as the timber that was the subject of that particular sub note.  Renasant also recorded UCC financing statements for every sub note on the relevant inventory, as well as timber deeds.  Sub notes were all single pay, one-year term notes, and were virtually always paid in full without the necessity of renewal, until WFP failed.  Prior to 2011, only one out of the 180 loans was

---

[7] The Debtors individually guaranteed every renewal of the Master Note since inception. Neither ever refused to sign a guaranty, and Renasant's representatives explained the loans to the Debtors each time they signed to guaranty a debt.

not paid in full at maturity.   At the time of WFP's failure, there were 21 outstanding sub notes, all made in 2011 or 2012.   These 21 outstanding sub notes (the "Sub Notes") essentially "maxed out" WFP's line of credit under the Master Note.   During the credit approval process for each Master Note renewal and Sub Note agreement, Renasant always requested, and the Debtors always provided, personal and business financial statements and tax returns.

Due to WFP and the Debtors' defaults under the Master Note, the Sub Notes, and the Debtors' continuing guaranty, Renasant obtained a judgment against WFP in the Circuit Court of Winston County, Mississippi, in the amount of $7,069,059.42.   An agreed judgment was entered in this adversary proceeding against Mr. Goodin in the same amount as the Circuit Court Judgment (A.P. Dkt. # 75).   Mrs. Goodin does not argue that she is not likewise obligated on this debt based upon the terms of the Debtors' continuing guaranties.   Accordingly, Renasant is entitled to a judgment against Mrs. Goodin in the amount of $7,069,059.42.   The only issue remaining, then, is whether this debt is dischargeable in her bankruptcy case.

## C. Financial Statements and Tax Returns

To support the underwriting of the various loans, the Debtors submitted financial statements and tax returns to Renasant for themselves

and for WFP each year from 2005 until 2011. These financial statements and tax returns were all professionally prepared by an accounting firm, based on information provided by the Debtors. Nothing on the face of the statements gave any indication that the information contained therein was inaccurate. The Goodins provided these statements and tax returns to Renasant in connection with WFP's applications for the loans, and the evidence was clear that Mrs. Goodin knew that they would be used by Renasant in underwriting the loans. Mrs. Goodin did not question the documents provided to Renasant. She testified that she had an opportunity to read them and ask questions about the documents, but that she did not do so.

Although not apparent to Renasant at the time of delivery, all of the financial statements and tax returns tendered after 2004 by the Debtors, personally, and on behalf of WFP, contained inaccurate and completely false information. For example, in 2005, WFP's tax returns showed that its timber inventory was valued at $2.5 million. By 2008, WFP's tax returns showed inventory had increased to around $3.3 million. WFP's tax returns for 2009, 2010, and 2011 each reflected inventory of around $3.3 million. Mr. Goodin admitted that the inventory values and income reflected on WFP's tax returns were overstated. In addition, the financial statements reflected that WFP owned equipment and other assets that neither WFP nor the Debtors

ever actually owned.  WFP also depreciated these fabricated assets on its tax returns.

In addition, the Debtors' personal financial statements were also false. The Debtors' personal financial statements showed a net worth of $1.1 million and debts of only $1,500 in 2007.  In 2011, the statements still reflected a net worth of around $1 million.  Mrs. Goodin testified that their net worth was never $1 million or more.  Next, the statements showed that the Debtors owned "farm equipment" worth $75,000.  It is clear now that the Debtors have never owned any farm equipment, much less farm equipment valued at $75,000.

Furthermore, none of the tax returns ever reflected a loss, despite Mr. Goodin's admission that WFP lost $500,000 in 2005, and that its losses amounted to $1.6 million by 2007.   Mr. McAdory testified that he relied on these tax returns and financial statements when recommending that Renasant make the loans to WFP, to be guaranteed by the Debtors.  Scott Williams, Renasant's workout officer, was also a member of Renasant's credit committee at the time many of the subject loans were made.  Mr. Williams credibly testified that the credit committee relied on the tax returns and financial statements and that it would not have approved the loans if its members had known that the documents were inaccurate and grossly overstated WFP's and the Debtors' income, inventory, and equipment.

Based on WFP's and the Debtors' written financial statements and tax returns, in 2012, when the balance owed on the Master Note was $2.5 million, Renasant's officers believed the bank had $3.2 million of timber collateral and an additional $500,000 worth of other collateral securing the Master Note.   In July 2012, just before filing bankruptcy, Mr. Goodin informed Renasant that almost all of the timber that secured the Master Note had already been cut and the proceeds dissipated.   Only around $200,000 of timber collateral remained to secure $2.5 million in loans.  The Debtors did not inform Renasant before July 2012 that the financial statements or tax returns were false, or that WFP had sold Renasant's collateral out of trust and failed to remit the proceeds.  Further, in April and May 2012, WFP pledged the same timber to both Renasant and Van's Logging and were paid twice for the same timber.  Both Mrs. Goodin and Mr. Goodin were involved in these transactions.

### D. Timber Appraisals

In addition to the financial statements and tax returns, Renasant also required WFP to provide timber appraisals on each tract of timber financed under a Sub Note to support the loan value.  WFP supplied Renasant with the resume of a forester named Chad Chisolm, and Renasant approved him as an appraiser.  Renasant submitted 84 timber appraisals into evidence that it had received from WFP, all appearing to be signed by Chad Chisolm.  All

but one of those appraisals was actually signed by Mr. Goodin, who completed the appraisals himself, and forged Chad Chisolm's name.  Mrs. Goodin is the one who actually faxed these appraisals to Renasant.  The Debtors both knew that Renasant would rely on these false appraisals in funding the Sub Notes.[8]

### E. Personal Knowledge of Distress

Despite Mrs. Goodin's position as an officer and director of WFP, she testified that she never inquired as to its finances or the Debtors' personal finances, nor did she seek to determine whether the documents she was signing were accurate.  There is no indication that Mr. Goodin actively concealed WFP's losses or the Debtors' financial condition from Mrs. Goodin, or that he would have refused to share them with her had she asked.  He testified that he did not want to worry her, but that he did inform her in 2009 or 2010 that "things were tight."  Even after knowing that the business was in trouble, Mrs. Goodin continued to expend WFP funds on personal expenses, funding a personal vacation to the Beau Rivage in south Mississippi on WFP's credit card just before filing bankruptcy.

Mrs. Goodin testified that she did not know whether or not the tax returns or financial statements she signed and provided to Renasant were

---

[8] The timber appraisals were clearly fabricated and part of the overall fraudulent scheme. That said, there was no evidence that Mrs. Goodin participated in the appraisal fabrication or knew of Mr. Goodin's forgery.  The Court's decision today is not based on the fraudulent appraisals.

accurate.   She further testified that she remembers nothing about the bankruptcy schedules that she helped prepare and signed under penalty of perjury in this bankruptcy case.   She maintains that she is unsophisticated, but $75 million flowed through the company on her watch.   She benefitted personally from the loans and from the way the Debtors operated WFP.   She signed financial statements and tax returns personally and on behalf of WFP. It is incredible that she neither suspected or knew of their falsity nor inquired as to their accuracy.

## III.   <u>CONCLUSIONS OF LAW</u>

Renasant asserts that the debt owed by Mrs. Goodin is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), (a)(2)(B), (a)(4), (a)(6), and (a) (11).   Renasant bears the burden of proof of establishing, by a preponderance of the evidence, that the debts in question should be excepted from discharge.   *Grogan v. Garner*, 498 U.S. 279, 286 (1991).   Section 523 provides, in relevant part, as follows:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
. . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--

(A)false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

12

          (B) use of a statement in writing--

               (i) that is materially false;

               (ii) respecting the debtor's or an insider's financial condition;

               (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

               (iv) that the debtor caused to be made or published with intent to deceive

. . .

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

    . . .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

    . . .

(11) provided in any final judgment, unreviewable order, or consent order or decree entered in any court of the United States or of any State, issued by a Federal depository institutions regulatory agency, or contained in any settlement agreement entered into by the debtor, arising from any act of fraud or defalcation while acting in a fiduciary capacity committed with respect to any depository institution or insured credit union;

11 U.S.C. § 523.

## A. Dischargeability under 11 U.S.C. § 523(a)(2)

Section 523(a)(2)(B) excepts from discharge those debts for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by "use of a statement in writing—

          (i) that is materially false;

          (ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
(iv) that the debtor caused to be made or published with intent to deceive . . . "

11 U.S.C. § 523(a)(2)(B).

### 1. Materially False Statement

"[A] materially false statement is one that 'paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit.'" *Byrd v. Bank of Miss.,* 207 B.R. 131, 136 (S. D. Miss. 1997)(quoting *Jordan v. Southeast National Bank (Matter of Jordan),* 927 F.2d 221, 224 (5th Cir. 1991) (*overruled in part by Coston v. Bank of Malvern (Matter of Coston),* 991 F.2d 257 (5th Cir. 1993))).

The material falsities contained in WFP's and the Debtors' personal financial statements and tax returns are not subject to debate. It is clear that the documents materially overstated the income of both WFP and the Debtors, listed equipment that did not exist, and overvalued WFP's inventory. In addition, the timber appraisals submitted by WFP in support of the valuation of the collateral underlying each of the Sub Notes were fraudulent and forged by Mr. Goodin.

At trial, the Debtors attempted to explain the decrease in timber values on a downturn in the economy after Hurricane Katrina. While the

Court understands the depreciation caused by this disaster, that downturn cannot explain why the Debtors misrepresented the collateral value and their net worth, nor can it explain the false representation of collateral that never actually existed.

Further, Mrs. Goodin testified that she was aware that the financial statements and tax returns would be used by Renasant its decision-making process and as a means of gauging whether or not to extend credit for the loans and that she had the opportunity to investigate the information on the documents, should she have chosen to do so.   Accordingly, the information contained in these documents was materially false.

The Court finds that Mrs. Goodin presented Rensasant with a substantially untruthful picture of her and WFP's financial conditions.   A review of the financial statements would lead one to believe that WFP and the Debtors had substantially more assets and more income than they actually did.   A financial statement is considered materially false – within the meaning of § 523(a)(2)(B) – if it contains "substantially untruthful information of a type which normally would bear on the Bank's credit making decision." *First Commercial Bank v. Robinson (In re Robinson)*, 192 B.R. 569, 576 (Bankr. N.D. Ala. 1996)(citing *Norris v. First Nat'l Bank (In re Norris),* 70 F.3d 27, 29 n. 10 (5th Cir.1995)).   Mr. McAdory testified at trial that he recommended the extensions of credit based on the Debtors' and WFP's

seemingly sound financial statements, tax returns,  and supporting appraisals, and that the sorts of falsehoods contained within them are of the type that would have a bearing on  decision to extend credit.  Furthermore, Mr. Williams, who actually served on the credit committee considering some of the Sub Notes, testified that Renasant would not have extended credit if the documents submitted by WFP and the Debtors accurately reflected their finances at the time.

### 2.  Concerning the Debtor's Financial Condition

As to the question of whether or not the writing concerns a debtor's financial situation, the Fifth Circuit has explained that the term "financial condition" is "meant to embody terms commonly understood in commercial usage rather than a broadly descriptive phrase intended to capture any and all misrepresentations that pertain in some way to specific assets or liabilities of the debtor." *Bandi v. Becnel (In re Bandi),* 683 F.3d 671, 676 (5th Cir. 2012).  The term "means the general overall financial condition of an entity or individual, that is, the overall value of property and income as compared to debt and liabilities." *Id.*

The very purpose of these sorts of financial statements it to provide a lender with the type of information it would need to assess the overall financial condition of a borrower before deciding to extend a loan.  At trial, Mrs. Goodin testified that she knew this was the reason they had to provide

16

financial statements in applying for the loans. There would be no other reason that Renasant would require these documents.  In short, personal financial statements, tax returns, and collateral appraisals are exactly the type of documents contemplated by this statute.  These supporting documents are specifically designed to paint a picture of an applicant's financial condition – detailing assets and liabilities and conveying to a lender what sort of financial security a borrower possesses. There is no doubt that the financial statements, tax returns, and collateral appraisals concern the Debtors' and WFP's financial conditions.

### 3.  Reasonably Relied

The Fifth Circuit has held that reasonableness of reliance under § 523(a)(2)(B) is a factual determination to be made in light of the totality of the circumstances. *Coston,* 991 F.2d at 261 (citation omitted).

> The bankruptcy court may consider, among other things: whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.

*Id.* "However, before making a determination on whether the reliance was reasonable, the court must first determine whether the reliance was actual." *In re Trimble*, 482 B.R. 546, 555 (Bankr. N.D. Miss. 2012).

> To establish actual reliance, the creditor must show its reliance
> on the false financial statement was "a contributory cause of the
> extension of credit and that credit would not have been granted if
> the lender had received accurate information." Although actual
> reliance must be demonstrated, a creditor does not have to show
> that it relied exclusively on the false financial statement. It is
> sufficient if the creditor establishes that it partially relied on the
> false statement.

*Colo. E. Bank & Trust v. McCarthy (In re McCarthy),* 421 B.R. 550, 560–61

(Bankr. D. Colo. 2009) (internal footnotes omitted).

In short, this element of § 523(a)(2)(B) is in fact a two-part

consideration: (1) whether or not the creditor actually relied on the

information in question, and (2) whether or not the creditor's reliance was

objectively reasonable. *See, e.g., In re Trimble*, 482 B.R. at 555; *In re Cohn,*

54 F.3d 1108, 1117 (3rd Cir. 1995)("[t]he reasonableness of a creditor's

reliance under § 523(a)(2)(B) is judged by an objective standard…").

### a. Actual Reliance

Both Mr. McAdory, the originating loan officer, and Mr. Williams, a

member of the credit committee and Renasant's workout officer, testified

credibly that, at all levels, Rensasant relied on the documents provided by

the Debtors and WFP in making the credit decisions regarding the Master

Note and the Sub Notes and the Debtors' continuing guaranties.

Although the evidence and testimony offered do not indicate that the

documents served as the sole basis for approving the financing, it is clear that

they were a major contributing factor.  As the court explained in *McCarthy*, a creditor need not show that it relied exclusively on the writing in question, but instead must show that the writing was at least partially relied upon in making the credit decision.  421 B.R. at 561.

### b.  Reasonable Reliance

Renasant's reliance on the Debtors' and WFP's representations was reasonable.  The financial statements, tax returns, and collateral appraisals are, objectively speaking, the type of document usually relied upon by creditors when deciding whether to extend financing to a borrower.  *See e.g., In re Norris,* 70 F.3d at 30; *In re Coston*, 991 F.2d at 259.  The purpose behind a borrower or guarantor providing such information to a bank is so that the bank can reasonably assess whether the borrower or guarantor has the necessary assets to repay the loan.

From all appearances, the Debtors and WFP had more than sufficient assets and income to fully secure the $2.5 million Master Note.  Through the documents, the Debtors and WFP led Renasant to believe there was well over $3 million in collateral available to it, but that was not true.  A review of the financial statements does not reveal any sort of "red flags" which might cast the extension of credit as an unreasonable decision. Finally, the long-standing lending and personal relationship between Mr. McAdory and the Debtors, which included over 100 repaid loans, indicated that Renasant

should have been able to rely on the Debtors' and WFP's representations. Nothing in their past dealings gave the impression that Renasant should have been suspicious or doubtful of the Debtors' truthfulness or honesty, or that Renasant should have doubted the veracity of the commercially-prepared financial statements and tax returns. *Colchester State Bank v. Phillips (In re Phillips)*, 367 B.R. 637, 645 (Bankr. C.D. Ill. 2007) (holding that "[w]here the debtor and the creditor have an ongoing relationship which has given rise to a relationship of trust, a creditor's reliance may be deemed reasonable without additional verification.").

There is no indication that Renasant conducted any research to verify the validity or accuracy of the financial statements.  However, courts have repeatedly held that a creditor's failure to verify financial statements – absent any "red flags" which should have made further investigation prudent – does not necessarily defeat reasonable reliance. *Webster Bank v. Contos (In re Contos)*, 417 B.R. 557, 567 (Bankr. N.D. Ill. 2009) (finding that creditor-bank was "reasonably entitled to rely upon the financial information provided by the Debtors because it had no reason to suspect that the Debtors were providing false information.").

Considering the totality of the circumstances – the absence of red flags, the parties' positive loan history, the professionally-prepared and consistent financial statements, tax returns, and appraisals– Renasant's actual reliance

on the financial statements, tax returns, and collateral appraisals was reasonable.

### c. Causing to be Made or Published with Intent to Deceive

Lastly, a creditor seeking a determination of nondischargeability under § 523(a)(2)(B) must demonstrate that the debtor caused the statement to be published with intent to deceive.

### i.   Published

As to the requirement that a debtor caused the financial statement to be made or published, "'published' is used in the same sense that it is used in defamation cases." S. REP. NO. 598, 9th Cong., 2d. Sess.78, (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5864.  That is to say, publication is the oral or written communication of the false information.  *See, e.g., Blake v. Gannett Co.,* 529 So. 2d 595, 602 (Miss. 1988); *Wallace v. Perry (In re Perry)*, 423 B.R. 215, 266-67 (Bankr. S.D. Tex. 2010) (holding that "[a] statement is published when it is said orally, put into writing or in print, and the statement was published in such a way that third parties are capable of understanding its defamatory nature.").  In this case, the Debtors and WFP published the misstatements concerning their financial conditions when they presented the documents to Renasant.  Mrs. Goodin herself often delivered or faxed the documents to Renasant.  Accordingly, publication is not in dispute.

### ii.   Intent to Deceive

"Whether a debtor in bankruptcy acted with the requisite 'intent to deceive' under § 523(a)(2)(B) is an issue of fact..." *Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 304 (11th Cir. 1994). As it is unlikely that an individual will freely admit to deceptive acts, the Fifth Circuit has held that deceit can be inferred from "reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation."*Norris*, 70 F.3d at 30 n. 12 (quoting *In re Miller*, 39 F.3d at 305). "[A]n honest belief, even if unreasonable, that a representation is true and that the speaker has information to justify it does not amount to an intent to deceive." *Gen. Elec. Capital Corp. v. Acosta (In re Acosta),* 406 F.3d 367, 372 (5th Cir. 2005) (citing *Palmacci v. Umpierrez,* 121 F.3d 781, 788 (1st Cir. 1997)).

The Court concludes that Mrs. Goodin did not hold a reasonable belief that that information contained in the documents was accurate or true. In fact, she testified that she had no opinion as to whether the information was true or untrue. She testified that she simply assumed it was true, because her husband told her to sign the documents. However, even if she did not know the extent of the misrepresentations contained in the documents, her signature on the documents and transmission of the same to Renasant, without investigation or knowledge as to their truthfulness, represented a

reckless disregard for the truth or falsity of them. *Banner Oil Co. v. Bryson (In re Bryson)*, 187 B.R. 939 (Bankr. N.D. Ill. 1995).   As stated by the Fourth Circuit,

> A wife who allows her husband to do business in her name and signs without question any sort of paper that he presents to her is not entitled to a discharge in bankruptcy merely because she has relied upon him where she has signed a statement as to her financial condition with 'reckless indifference to the actual facts, without examining the available source of knowledge which lay at hand, and with no reasonable ground to believe that it was in fact correct.'

*David v. Annapolis Banking & Trust Co.,* 209 F.2d 343, 344 (4th Cir. 1953) (citing *Morimura, Arai & Co. v. Taback,* 279 U.S. 24 (1929)); *see also Haney v. Copeland (In re Copeland),* 291 B.R. 740, 786-89 (Bankr. E.D. Tenn. 2003); *Steinberg v. Creswell & Co., Inc. (In re Halls Trading Post, Inc.),* 15 B.R. 781, 784 (Bankr. E.D. Tenn. 1981) ("[O]ne having the ability and opportunity to inform [herself] of the contents of a writing before [she] executes it will not be allowed to avoid the effect of it by showing that [she] was ignorant of its contents or that [she] failed to read it.") (quoting *Evans v. Tillett,* 545 S.W.2d 8, 11 (Tenn. Ct. App. 1976)).

Since at least 2010, Mrs. Goodin knew that they "were behind" and that "things were tight," but she continued to sign personal financial statements showing a personal net worth of $1 million.   It is simply unbelievable that Mrs. Goodin did not know that the documents were, at a minimum, grossly

exaggerated.   Even if she did not know, however, she certainly should have known.   An individual cannot disclaim responsibility for a document she signs in any capacity when she had the ability to read the document and ascertain its accuracy before signing it. The Court finds that such behavior (or willful ignorance) amounts to the sort of "reckless disregard for the truth" contemplated by the Fifth Circuit in *Norris*.   70 F.3d at 30 n. 12 (citation omitted).

Further, although Mrs. Goodin testified that she is a simple housewife and helpmate who had no input or knowledge of WFP's business, the Court finds that Mrs. Goodin had more than enough experience in these sorts of matters so that she was adequately aware of her actions and their ramifications.[9] Mrs. Goodin has worked alongside her husband for decades in a multi-million dollar business.   Moreover, Mrs. Goodin aquitted herself very well during trial.   She is not unsophisticated.   She clearly understood what questions might implicate her and demonstrated a cohesive theory that was reflected in her questions of the witnesses and in her arguments.   She focused

---

[9] Mrs. Goodin's arguments regarding her culpability amount to a claim of an "innocent spouse"-style defense. The "innocent spouse rule" mitigates a married couple's joint and several liability for income taxes by relieving one spouse from liability when that spouse did not know, and had no reason to know, of an understatement of taxes owing reflected on a joint return.  26 U.S.C. § 6015(b); *see, e.g., Park v. Commissioner of Internal Revenue,* 25 F.3d 1289 (5th Cir. 1994); *In re French,* 242 B.R. 369, 377-78 (Bankr. N.D. Ohio 1999). There is no similar defense available in nondischargeability actions.  *See David v. Annapolis,* 209 F.2d 343. An individual is liable for her own misrepresentations and for those she makes on behalf of another entity.

on whether the bank's reliance was justifiable as well as her own knowledge and intent.   Regardless of whether she actually knew of the fraudulent nature of both her personal financial statements and those she transmitted on behalf of WFP, she had a duty to know as a corporate officer and a personal guarantor.   This is especially true as she made these material misrepresentations to Renasant over an extended period of time.   She signed the false financial statements and tax returns and presented them to Renasant, anticipating its reliance on them and accepting the benefits that flowed from the loans.   She is responsible for the material misrepresentations, and her debt to Rensasant is therefore nondischargeable under 11 U.S.C. § 523(a)(2)(B).

### B. Nondischargeability under 11 U.S.C. § 523(a)(6)

In addition, the debt to Renasant is also nondischargeable under § 523(a)(6).   This subsection excepts from discharge debts for a willful and malicious injury by the debtor to another entity or to the property of another entity.   The United States Supreme Court has held that a willful injury, in this context, is a "deliberate or intentional *injury,* not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998)(emphasis in original).   Accordingly, debts found to be nondischargeable under § 523(a)(6) arise from an intentional tort.   In interpreting *Kawaauhau,* the Fifth Circuit has held that an injury is "'willful and malicious' where

there is either an objective substantial certainty of harm or a subjective motive to cause harm." *Miller v. J.D. Abrams Inc. (In re Miller),* 156 F.3d 598, 606 (5th Cir. 1998); *Williams v. Int'l Brotherhood of Electrical Workers Local 520 (In re Williams),* 337 F.3d 504, 508–09 (5th Cir. 2003). Accordingly, under *Miller*, in order to prove nondischargeability under § 523(a)(6), the creditor must prove by a preponderance of the evidence that the debt it seeks to except from discharge was the result of willful and malicious injury by the debtor to the creditor or the creditor's property. An injury (financial or otherwise) is "willful and malicious" where there is either (1) an objective substantial certainty of harm; or (2) a subjective motive to cause harm.

In this case, it is clear to the Court that Mrs. Goodin's actions were not undertaken with a subjective intent to cause harm to Renasant. However, when a borrower or guarantor overvalues assets, overstates income, invents collateral, and fabricates collateral appraisals, and then transmits this fraudulent information to a lender to obtain loans for which she would otherwise not qualify, there is an objective substantial certainty of harm to the recipient of this information. Accordingly, the debt to Renasant is also nondischargeable under 11 U.S.C. § 523(a)(6).

## C. Nondischargeability Under Other Subsections

Renasant also alleges that the debts owed to it are nondischargable under 11 U.S.C. §§ 523(a)(2)(A), (a)(4), (a)(6), and (a)(11). At trial, Renasant

conceded that § 523(a)(4) was inapplicable.[10]   In addition, the Court finds

that § 523(a)(2)(A) is also inapplicable.   Subsection (a)(2)(A) excepts from

discharge debts obtained by fraud, *other than a statement respecting the*

*debtor's or an insider's financial condition.*   11 U.S.C. § 523(a)(2)(A)(emphasis

added).   All of the statements at issue in this case relate to Mrs. Goodin's and

WFP's financial condition, and thus are excluded from the reach of §

523(a)(2)(A)(but covered as discussed above by § 523(a)(2)(B)).   Finally, §

523(a)(11) excepts from discharge debts that arise from fraud or defalcation

with respect to a bank.   11 U.S.C. § 523(a)(11).   While the language of this

subsection does not necessarily limit its application to bank officers or

employees, neither Renasant nor the Court has found a case in which it is

applied against anyone other than a bank employee or officer.   Because the

Court has already held the debt nondischargeabile under other subsections,

there is no need for the Court to resolve the issue of the applicability of §

523(a)(11) at this time.   Likewise, there is no need for the Court to examine

---

[10] Section 523(a)(4) excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."   11 U.S.C. § 523(a)(4).   The phrase "debt for" means "debt arising from" or "debt on account of."   *Cohen v. de la Cruz,* 523 U.S. 213, 220 (1998).   In order to prevail on a § 523(a)(4) claim, a creditor must show (1) that the requisite fiduciary relationship existed prior to the particular transaction from which the debt arose.   *See, e.g., Wright v. Menendez (In re Menendez),* 107 B.R. 789, 793 (Bankr. S.D. Fla. 1989); and (2) that some type of fraud or defalcation occurred during the fiduciary relationship.   *In re Chavez*, 140 B.R. 413, 422 (Bankr. W.D. Tex. 1992).   Such a relationship must exist prior to the alleged wrongful acts and without reference to those acts.   *Rain Bird Corp. v. Salisbury (In re Salisbury)* 331 B.R. 682, 692 (Bankr. N.D. Miss. 2005)(citation omitted).   No such prior fiduciary relationship between the parties has been alleged.

either the necessity of piercing the corporate veil or Mrs. Goodin's vicarious

liability for her husband's fraudulent actions, as her own misrepresentations

result in the nondischargeability of Renasant's claim under § 523(a)(2)(B) and

(a)(6).

## IV.   <u>CONCLUSION</u>

Accordingly, Mrs. Goodin's actions in the preparation and presentation

of the financial statements are of the type contemplated by 11 U.S.C. §

523(a)(2)(B), and the debts arising there from should therefore be excepted

from discharge.  Mrs. Goodin presented Renasant with statements in writing,

concerning her and WFP's financial condition, which were materially false.

The financial statements and tax returns contained baseless exaggerations of

collateral values, falsified information concerning assets that did not exist,

and fraudulent collateral appraisals.  Further, the Court finds that, based on

the totality of the circumstances, Renasant both actually and reasonably

relied on the financial statements.  There were no readily apparent "red

flags" which should have given Renasant cause for concern.  Renasant had a

positive history of lending to the Debtors and WFP, and no circumstances or

incidents during the time in question should have inspired suspicion that

these transactions would be any different. Lastly, the Court finds that the

Mr. Goodin possessed the requisite intent under Fifth Circuit precedent to

deceive when he caused to be prepared and presented the Financial

Statements.  Mrs. Goodin at a minimum had a duty to know of their falsity.

Accordingly, the Court finds that the debts in question are nondischargeable

as to Mrs. Goodin under 11 U.S.C. § 523(a)(2)(B).  In addition, because her

actions were objectively certain to cause harm to Renasant, the debt is also

nondischargeable under § 523(a)(6).  A separate final judgment will be

entered in accordance herewith.

##END OF OPINION##